796 A.2d 866

HARVEY MUSIKOFF, PLAINTIFF–RESPONDENT, v. JAY PARRINO'S THE MINT, L.L.C. AND JASPAR PARRINO, ALIAS JAY PARRINO, DEFENDANTS.

STARK & STARK, A PROFESSIONAL CORPORATION, APPELLANT.

Argued March 12, 2002—Decided May 16, 2002.

134

*Lewis J. Pepperman,* argued the cause for appellant (*Stark & Stark,* attorneys; *Mr. Pepperman, Scott I. Unger* and *John R. Sawyer,* of counsel and on the brief).

*Bonnie M. Weir,* argued the cause for respondent (*Kern Augustine Conroy & Schoppmann,* attorneys; *Steven I. Kern,* of counsel; *Ms. Weir* and *Mr. Kern,* on the brief).

The opinion of the Court was delivered by

VERNIERO, J.

We are called on to answer a question of law certified and submitted by the United States Court of Appeals for the Third Circuit. This is the first time that this Court will answer such a question pursuant to the procedures set forth under *Rule* 2:12A. The inquiry involves *N.J.S.A.* 2A:13–5, known as the Attorney's Lien Act (the Act). As certified, the question is:

> Whether under New Jersey law, in order to enforce a lien under [*N.J.S.A.*] 2A:13–5, an attorney must file a petition to acknowledge and enforce the lien prior to any settlement or final judgment in the underlying matter in which the attorney provided services giving rise to the lien? In other words, is the last sentence of [*N.J.S.A.* 2A:13–5] ("The court in which the action or other proceeding is pending, upon the petition of the attorney or [counsellor] at law, may determine and enforce the lien") intended to control the forum where the petition is brought or the timing of the petition?

Our answer is that the Act's last sentence controls the forum in which a petition is brought, not the timing of the petition. Stated differently, we conclude that the Act does not require an attorney to file a petition to acknowledge and enforce an attorney's lien prior to settlement or judgment in the matter that has given rise to the lien itself.

I.

The parties do not dispute the essential facts. In June 1998, Harvey Musikoff (respondent) retained the services of the Stark & Stark law firm (appellant) to represent him in a then-pending civil matter before the United States District Court for the District of New Jersey. (Appellant had replaced respondent's prior attorney, David L. Ganz.) The matter consisted of a lawsuit filed against Jay Parrino's The Mint, L.L.C. and Jaspar Parrino (collectively, defendant), in which respondent alleged that defendant had defrauded

him in a commercial transaction. Appellant and respondent entered into a written fee agreement that included a $10,000 retainer. Subsequent to that agreement, respondent elected to change attorneys. In February 2000, respondent's new attorney, Seth Josephson, informed appellant of the substitution. A month later, appellant informed Josephson by letter that it had a lien for unpaid legal services and expenses stemming from its prior representation of respondent.

The litigation between respondent and defendant was settled. Accordingly, the District Court dismissed respondent's action without costs and without prejudice on April 26, 2000.

On May 10, 2000, appellant sent a second letter to Josephson inquiring about the status of respondent's case. A week later, appellant received a response from a different attorney, Armen R. Vartian, a member of the California bar. Vartian did not reveal that the case had been settled but instead stated that respondent had terminated Josephson's services and had authorized him (Vartian) "to direct the litigation going forward." Vartian's letter to appellant also stated that "[t]he status of the case is that it is pending, although the May trial date has been adjourned."

Only after appellant contacted defendant's attorney did it learn that the matter had been settled and that a check for an undisclosed amount had been sent to Vartian. Appellant and Vartian exchanged several letters, but, ultimately, respondent refused to recognize appellant's lien.

On June 2, 2000, appellant sent respondent a letter informing him of his right to pursue arbitration of their fee dispute as provided under the New Jersey Rules of Court. The letter also informed respondent that if he failed to pursue fee arbitration within thirty days, appellant would bring suit against him and his attorney to recover the disputed fees. Respondent did not pursue arbitration.

On June 14, 2000, appellant moved before the District Court seeking an acknowledgement of an attorney's lien under the Act

and an order to compel respondent or his attorney to deposit the settlement proceeds into a trust pending the outcome of the fee dispute. The District Court denied that motion. Relying on recent New Jersey case law, the court reasoned that under the Act an attorney must file a petition to enforce a lien while the underlying proceeding is still pending. The court concluded that appellant did not have a valid and enforceable lien because it had failed to file its petition prior to April 26, 2000, the date on which respondent's action was dismissed. (The court also concluded that appellant, in filing its petition, had failed to comply with certain requirements found in *Rule* 1:20A-6. That issue is beyond the scope of the certified question.)

Appellant sought relief before the Third Circuit. That court, in turn, certified the question noted above, and we accepted the question as certified. 170 *N.J.* 203, 785 *A.*2d 432 (2001).

## II.

An attorney's right to impress a lien on client property derives from the common law. Kevin H. Michels, *New Jersey Attorney Ethics* § 37:2-2a at 831 (2002). Generally, our courts have recognized "two forms of liens for the collection of fees, the charging (or special) lien and the retaining lien." *Ibid.* We have explained:

> The common law retaining lien attaches to all papers, books, documents, securities, moneys, and property of the client which come into the possession of the attorney in the course of, and with reference to, his professional employment. It is a general lien which gives an attorney the right to retain possession of his client's property until the entire balance due him for legal services, as well as for costs and disbursements, is paid. . . . The retaining lien is distinguishable from the common-law special or charging lien which an attorney may have for services rendered in a particular cause of action and which attaches to the judgment in the cause for which the services were rendered. The charging lien may be actively enforced and does not rest upon possession.
>
> [*Brauer v. Hotel Assocs., Inc.*, 40 *N.J.* 415, 419-20, 192 *A.*2d 831 (1963) (internal citations omitted).]

Except for some slight revisions, the Attorney's Lien Act is virtually identical to prior legislation, *L.* 1914, *c.* 201, enacted almost a century ago. The Act currently provides:

> After the filing of a complaint or third-party complaint or the service of a pleading containing a counterclaim or cross-claim, the attorney or counsellor at law, who shall appear in the cause for the party instituting the action or maintaining the third-party claim or counterclaim or cross-claim, shall have a lien for compensation, upon his client's action, cause of action, claim or counterclaim or cross-claim, which shall contain and attach to a verdict, report, decision, award, judgment or final order in his client's favor, and the proceeds thereof in whosesoever hands they may come. The lien shall not be affected by any settlement between the parties before or after judgment or final order, nor by the entry of satisfaction or cancellation of a judgment on the record. The court in which the action or other proceeding is pending, upon the petition of the attorney or counsellor at law, may determine and enforce the lien.
>
> [*N.J.S.A.* 2A:13–5.]

■ The statute not only codifies the common-law special or charging lien, "but it also expands the common law lien which had attached only to a judgment." *Martin v. Martin,* 335 *N.J.Super.* 212, 222, 762 *A.*2d 246 (App.Div.2000) (citing *Norrell v. Chasan,* 125 *N.J.Eq.* 230, 236–37, 4 *A.*2d 88 (E. & A.1939)). An attorney's statutory lien attaches broadly to any "verdict, report, decision, award, judgment or final order in his [or her] client's favor, and the proceeds thereof in whosesoever hands they may come." *N.J.S.A.* 2A:13–5; *see also* Michels, *supra,* § 37:2–2b(2) at 833 (describing expansive character of lien). The statute's reach, however, is not unlimited. For example, there is no authorization for "an attorney's lien to be asserted for post-judgment legal services." *Panarello v. Panarello,* 245 *N.J.Super.* 318, 322, 585 *A.*2d 428 (Ch.Div.1990); *cf. Steiger v. Armellino,* 315 *N.J.Super.* 176, 180, 716 *A.*2d 1216 (Ch.Div.1998) (holding that Act did not prevent lien from attaching to subsequent matter that stemmed from original pleadings).

■ The statute also must be viewed in concert with the applicable Rules of Court. See *Mateo v. Mateo,* 281 *N.J.Super.* 73, 78–80, 656 *A.*2d 846 (App.Div.1995) (discussing pre-action notice requirements under Rules). If a client has requested fee arbitration under the Rules, then the fee arbitration committee will determine the amount of the attorney's lien. *R.* 1:20A–3. If the client does not request fee arbitration, the court will resolve the lien dispute after conducting a plenary hearing. *Cole, Schotz,*

*Bernstein, Meisel & Forman, P.A. v. Owens,* 292 *N.J.Super.* 453, 458, 679 *A.*2d 155 (App.Div.1996).

## III.

▊ Against that backdrop, our analysis is guided by familiar canons of construction. "If the plain language of a statute creates uncertainties or ambiguities, a reviewing court must examine the legislative intent underlying the statute and 'construe the statute in a way that will best effectuate [that] intent.'" *New Jersey State League of Municipalities v. Dep't. of Cmty. Affairs,* 158 *N.J.* 211, 224, 729 *A.*2d 21 (1999) (citation omitted). In undertaking that task, courts may ascertain the intent of the drafters by looking to extrinsic sources such as the statute's underlying purpose and history. *Clymer v. Summit Bancorp.,* 171 *N.J.* 57, 66, 792 *A.*2d 396 (2002) (citing *Aponte–Correa v. Allstate Ins. Co.,* 162 *N.J.* 318, 323, 744 *A.*2d 175 (2000)). "Above all, [a court] must seek to effectuate the 'fundamental purpose for which the legislation was enacted.'" *Township of Pennsauken v. Schad,* 160 *N.J.* 156, 170, 733 *A.*2d 1159 (1999) (citation omitted).

▊ The critical language in dispute is the Act's last sentence: "The court in which the action or other proceeding is *pending,* upon the petition of the attorney or counsellor at law, may determine and enforce the lien." *N.J.S.A.* 2A:13–5 (emphasis added). Respondent argues that that language is clear and unambiguous and should be interpreted to mean that the petition for an attorney's lien must be submitted when the underlying action is pending. Under that construction, appellant's petition would be unenforceable because it was filed after the District Court had entered its order dismissing respondent's action.

Appellant argues that respondent's interpretation ignores the Act's immediately preceding sentence, "The lien shall not be affected by any settlement between the parties before or after judgment or final order, nor by the entry of satisfaction or cancellation of a judgment on the record." *Ibid.* As noted, the Act also declares that the lien shall attach to "a verdict, report,

decision, award, judgment or final order in [the] client's favor[.]" *Ibid.* That language suggests that a court, in determining the amount of the lien, may consider services rendered by the attorney in connection with a settlement or any other disposition favorable to the client. Under appellant's interpretation, the Act would authorize an attorney to wait at least until the conclusion of the underlying action before filing the lien petition.

We are persuaded by the parties' respective contentions that the Court is confronted with an ambiguity that requires consideration of extrinsic factors to resolve. *Clymer, supra,* 171 *N.J.* at 66, 792 *A.*2d 396. In considering those factors, we conclude that the Act's last sentence is intended to identify the forum in which a petition is brought, not to limit the time period within which the petition must be filed. Our rationale is threefold.

First, "[o]ur task is to interpret the statute sensibly," *Alderiso v. Med. Ctr. of Ocean County, Inc.,* 167 *N.J.* 191, 199, 770 *A.*2d 275 (2001), consistent with a common-sense understanding of its underlying subject matter. *Dynasty, Inc. v. Princeton Ins. Co.,* 165 *N.J.* 1, 19, 754 *A.*2d 1137 (2000). In that respect, we agree with appellant that the Act's language that explicitly refers to "any settlement between the parties" evinces a legislative intent to permit attorneys to file lien petitions in the aftermath of such settlements. Appellant's construction is consistent with our everyday sense of the Act's purpose, which is to protect unpaid attorneys in this setting. Moreover, the main focus of the Act's last sentence is on the court and its explicit authority to "determine and enforce the lien." *N.J.S.A.* 2A:13–5. That focus suggests that the drafters were more concerned with identifying the forum in which the lien petition would be evaluated and enforced than with limiting the period during which the petition could be filed.

Second, as indicated, the Act sought to codify and expand the common law charging lien "to protect attorneys who do not have actual possession of assets against clients who may not pay for services rendered." *Martin, supra,* 335 *N.J.Super.* at 222, 762

A.2d 246. "The lien is rooted in equitable considerations, and its enforcement is within the equitable jurisdiction of the courts." *Ibid.* The remedial and equitable underpinnings of the Act militate in favor of appellant's construction.

Consistent with such equities, appellant promptly notified respondent's subsequent attorneys of its claimed lien and diligently sought updates on the progress of the underlying suit. Through no apparent fault of its own, appellant did not learn of respondent's settlement until after it had occurred and did not file its petition prior to that resolution. We do not believe that the Legislature would have intended an attorney in those circumstances to fall outside the protections of the Act.

Third, decisions reported prior to 1959 generally are consistent with our answer. One of the earliest decisions is *McCarthy v. McCarthy,* 117 *N.J.Eq.* 22, 174 *A.* 751 (E. & A.1934). In that case, the court evaluated a petition filed "several months" after the decree in the underlying matter had been entered. *Id.* at 23, 174 *A.* 751. Although the court ultimately denied relief, it did so for reasons other than the timing of the petition. *Id.* at 25, 174 A. 751. One such reason was that the attorney asserting the lien actually had disbursed the proceeds of the litigation to his client. *Ibid.* The court thus concluded that the attorney had waived his lien rights to those proceeds, *ibid.,* a factor that does not appear to be present here.

The *McCarthy* court also noted that "[t]he lien was designed to prevent clandestine or collusive settlements of the litigation between the parties thereto, without the participation of the attorney and without affording him an opportunity to secure compensation from the avails of the litigation." *Ibid.* In this case, appellant had no knowledge of the settlement proceeds until after the settlement had occurred, a circumstance that would militate in favor of appellant's interpretation of the Act.

Similarly, in *James v. Harris,* the attorney filed a petition to enforce an attorney's lien after the underlying matter had been settled by different counsel. 42 *N.J.Super.* 468, 470, 127 *A.*2d 215

(Law Div.1956). The former client objected, arguing "that there can be no lien where settlement and dismissal have taken place, since there is no action pending before the court[.]" *Ibid.* The court rejected that argument, stating "that the statutory provision regarding pendency of action can be no more than directive of the forum in which the action was instituted as the proper court in which to pursue the remedy." *Id.* at 471, 127 *A.*2d 215. The court also rejected the argument that the lien was unenforceable in view of the fact that the proceeds from the underlying litigation had been disbursed. *Ibid.* The court explained:

> Retention of assets is not a feature of this lien, nor is the existence of a specific and isolated fund essential to its vitality. It is a special or charging lien which depends simply upon the right to have the court intervene to determine the amount of compensation properly due an attorney and to arm him with a judgment in that amount, which may be enforced against persons who have received the proceeds of judgment or settlement or who disbursed funds in settlement without due regard for the pending lien.
>
> [*Ibid.*]

A different court reasoned similarly in *Guernsey v. Young,* 49 *N.J.Super.* 339, 139 *A.*2d 799 (Ch.Div.1958). In that case, the parties reached a settlement unbeknownst to the plaintiff's attorneys, who were given notice of the settlement after it had occurred. *Id.* at 340, 139 *A.*2d 799. The court held that the attorneys had a valid and enforceable lien under the Act, concluding that "[i]n making payment direct[ly] to the plaintiff without notification to her attorneys, the [other party] did so at his peril." *Ibid.* Thus, on facts similar to those presented here, the court concluded that "[p]laintiff's attorneys are entitled to receive their disbursements and such reasonable fee as the court may determine after a hearing." *Ibid.*

In urging a contrary conclusion, respondent relies on more recent New Jersey case law, as did the District Court in denying appellant's motion. That reliance is understandable given certain language in one of those cases, *H. & H. Ranch Homes, Inc. v. Smith,* suggesting that attorneys must file their lien petitions "as a step in the proceeding of the main cause[.]" 54 *N.J.Super.* 347, 353, 148 *A.*2d 837 (App.Div.1959). Most New Jersey courts after

*H. & H.* either have repeated that language or stated without independent analysis that an attorney's lien petition must be filed while the underlying action is pending. *See, e.g., Mateo, supra,* 281 *N.J.Super.* at 79, 656 *A.*2d 846 (stating that proceeding under Act "must be brought as a step in the main cause, but tried as a separate and distinct plenary action"); *Panarello, supra,* 245 *N.J.Super.* at 322, 585 *A.*2d 428 (stating that Act "provides that for a lien to be effective it must be brought during the time the action or other proceeding is pending"); *but cf. Fuessel v. Cadillac Bar Corp.,* 63 *N.J.Super.* 430, 437, 164 *A.*2d 821 (App.Div.1960)(reversing lower court's grant of lien petition on grounds other than filing of petition after underlying action had been settled).

In *H. & H., supra,* the attorney, Michael J. Dwyer, represented the defendants, Frank H. Smith and his wife, in an action instituted by the plaintiff, H. & H. Ranch Homes, Inc., in the Law Division. 54 *N.J.Super.* at 350, 148 *A.*2d 837. Dwyer filed an answer and counterclaim on behalf of the Smiths, "and performed numerous other services in the protection and prosecution of his clients' rights in the matter." *Ibid.* The Smiths subsequently retained new counsel. *Id.* at 350–51, 148 *A.*2d 837.

Dwyer mailed a bill to the Smiths and two months later advised the clients' new attorney, Daniel Gilady, that he (Dwyer) had an attorney's lien "on any judgment which might be obtained in the action." *Id.* at 351, 148 *A.*2d 837. The trial in the underlying matter was held and "lasted 16 days and resulted in a judgment for Smith and his wife on their counterclaim[.]" *Ibid.* Although the factual summary contained in the court's opinion is not entirely clear, it appears that after the Smiths successfully obtained their judgment, "Gilady suggested that Dwyer file a petition in the *main cause.* Thereafter Dwyer served both Gilady, as attorney for the Smiths, and the attorney for Ranch Homes, with a notice of his intention to move before the trial court 'for an order awarding counsel fees and disbursements.'" *Ibid.* (emphasis add-

ed). The trial court dismissed Dwyer's motion, concluding that it lacked jurisdiction under the Act. *Ibid.*

On those facts, the Appellate Division confronted two issues: "(1) whether Dwyer [had] an attorney's lien by virtue of [*N.J.S.A.* 2A:13–5], and (2) the method and mechanics of impressing such a lien upon Smith's judgment." *Ibid.* In resolving the first issue, the court concluded that the filing of the counterclaim fell within the purview of the Act and that Dwyer's "voluntary delivery of the papers and consensual substitution of counsel did not terminate his lien." *Id.* at 352, 148 *A.*2d 837. In respect of the second issue, the court stated in a lengthy passage that is often cited in the case law:

> For the guidance of counsel in connection with future applications, consistent with the spirit of our present rules of practice, we suggest that, where the determination or enforcement of an attorney's lien is sought, the following procedure ... be employed: The attorney should make application to the court, *as a step in the proceeding of the main cause,* by way of petition, which shall set forth the facts upon which he relies for the determination and enforcement of his alleged lien. The petition shall as well request the court to establish a schedule for further proceedings which shall include time limitations for the filing of an answer by defendants, the completion of pretrial discovery proceedings, the holding of a pretrial conference, and the trial. The court shall, by order, set a short day upon which it will consider the application for the establishment of a schedule. A copy of such order, together with a copy of the petition, shall be served upon defendants as directed by the court. The matter should thereafter proceed as a plenary suit and be tried either with or without a jury, in the Law Division[.]
>
> [*Id.* at 353–54, 148 *A.*2d 837 (emphasis added).]

The panel reversed and remanded to the trial court "with the direction to proceed *de novo* in the manner above outlined." *Id.* at 354, 148 *A.*2d 837. Interestingly, if the chronology of facts is as suggested by the court's summary, then Dwyer was advised by Gilady to file the lien petition after the Smiths had obtained their final judgment. The implication is that the "main cause" language contained in *H. & H.,* and repeated in subsequent State court opinions, never was intended to mean that an attorney had to file the lien petition prior to the conclusion of the client's underlying action. In any event, even if we were to assume that the phrase was intended to mean precisely as respondent contends, it would

be at odds with the Act's purpose for the reasons already expressed. Accordingly, *H. & H.* does not alter our analysis.

In sum, the Act is grounded in equitable principles and was designed to protect attorneys who have represented their former clients competently and with diligence, but have gone unpaid. In furtherance of that design, the Act describes the forum in which a lien petition may be brought; it does not limit the period within which the petition must be filed. We affirm the basic elements of the process articulated in *H. & H.*, except that we do not interpret the process to require an attorney to file and enforce a lien petition prior to settlement or judgment in the underlying action. Our conclusion is consistent with the Legislature's intent in enacting the statute, faithful to the Act's common-law roots, and reflective of a sensible reading of the statute's text.

## IV.

In citing the relevant facts for purposes of analysis, the Court does not intend to address any issue beyond the scope of the certified question. We express no view on whether appellant properly satisfied the applicable Rules of Court as a prerequisite to enforcement of its petition. Nor do we express an opinion in respect of the time period in which a petition must be filed, except to note that appellant filed its motion before the District Court within forty-five days of appellant's learning of that court's order dismissing respondent's action. That timeframe appears reasonable to this Court, although we could envision a longer limitations period depending on the facts and equities of a given case. In any event, to ensure the fair and prompt resolution of all disputes, attorneys should not delay in asserting their liens under the Act.

*For the judgment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA, and ZAZZALI—7.

*Opposed*—None.